63 N.J. Super. 438 (1960)
164 A.2d 809
ADDIE ARGROE, PETITIONER-RESPONDENT,
v.
FRANK AND CARMEN MARINACCIO, A PARTNERSHIP, T/A MORRIS PLAINS AMOCO SERVICE STATION, RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 1960.
Decided November 1, 1960.
*439 Before Judges CONFORD, FOLEY and LEONARD.
Mr. Harry L. Sears argued the cause for petitioner-respondent (Messrs. Young & Sears, attorneys; Mr. William P. Westling, on the brief).
Mr. Arthur F. Mead argued the cause for respondents-appellants (Messrs. Mead, Gleeson, Hansen & Pantages, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
The petitioner, widow of Paul Argroe, was denied an award of death benefits in the Workmen's Compensation Division. On the trial de novo in the County Court, judgment was entered in her favor and respondents appeal.
The essential facts are not in substantial dispute. Respondents operate a gasoline and service station in Morris Plains, New Jersey. Decedent commenced his employment there as a service station attendant on a part-time basis in February 1955 and became a full-time employee in April of that year. Thereafter his working hours were 8:00 A.M. until 6:00 P.M. He performed the usual duties of "pumping gas and lubricating and changing oil and things like that." However, because of the peculiar nature of respondents' business operation, his job encompassed other activities in behalf of his employer of a somewhat unusual nature. The *440 bulk of respondents' customers were employed in nearby plants and their cars were serviced at the station while they were at work. The volume of respondents' business was such that on busy days as many as 20 or 30 cars would be serviced and on other days as few as 10 or 12 cars. The business had been built up and maintained by an arrangement whereby the two partners and the decedent would drive to the various plants, pick up customers' vehicles and bring them to the station, leaving their own cars behind. Upon completion of the work they would then drive the customers' cars back to the plants at which they had been picked up and return to the station in their own vehicles. Respondents maintained three automobiles for this purpose. Neither at the time of the original hiring nor later when decedent's full-time employment commenced was there any discussion between the parties regarding the use of decedent's personal car which he drove to and from the station daily. However, as time went on a practice grew up where, by tacit consent, his car was used interchangeably with those of the respondents in the pickup and delivery service, both by himself and by his employers.
Shortly after the hiring, decedent was told by the partners that when business was slack he was at liberty to use respondents' facilities, including a hydraulic lift, in servicing his own vehicle. This privilege was extended at least in part because petitioner often stayed to help out after 6:00 P.M. for which services he received no additional compensation. The understandably informal nature of the employer-employee relationship and the incidents thereof are best illustrated by the following excerpts from the testimony of Carmen Marinaccio:
"Q. Now, would you explain to what extent Paul's vehicle was used; Paul Argroe's vehicle was used in this operation, if it was used? A. He used his car just like we used our own for picking up cars and maybe picking up parts in town, I guess that is about it.
Q. Did he ever use any other vehicle that was there? A. Yes.
*441 Q. Did you or your brother ever use Paul's vehicle to make pick ups? A. We used it on several occasions.
Q. How about your brother Frank? A. I said he said he used it too.
Q. Did you ask Paul's permission before you used his vehicle? A. I think it was an understanding that  I don't really recall whether I did ask him or not. Maybe I just took it for granted. I don't know whether I actually asked him or not, but it was understood because I would allow him to lubricate his own car and anything like that.

* * * * * * * *
Q. On those days when there was only two cars, you would require Paul's vehicle to make the pick ups? A. Yes.
Q. You actually needed Paul's car on those days? A. Well, it helped, yes.
Q. Would you say it was to your advantage to have Paul Argroe's car in good working order insofar as your business was concerned? A. Very much so. Not only of the fact that he used it in the business, but that he would get to and from work."
When using respondents' facilities for the servicing of his own car decedent was charged the wholesale price for oil, but grease was furnished free of charge and he paid the regular pump price for gasoline. He received no compensation whatever for the use of the car on the business of the partnership.
On several occasions prior to November 16, 1955 the decedent had mentioned to Carmen Marinaccio that he would like to replace his "Hollywood muffler" with a regulation muffler. On that day he spoke of it again and Carmen told him that there was a spare muffler in the shop which he could have. At about 4:15 P.M., while the vehicle was on the lift and Argroe was preparing to make the installation, the car rolled backward off the lift and crushed him to death.
The sole question for determination is whether the accidental injury which resulted in death arose "out of and in the course of" decedent's employment. R.S. 34:15-7.
The predicate of the dismissal entered in the Division was that the act of using the lift in these circumstances was purely personal to the employee and that such activity afforded no benefit to the employer. The County Court, on the other hand, concluded that the activity was for the mutual benefit *442 of both the employee and the employer (the benefit derived by the latter being found to be the furtherance of a sound employer-employee relationship), and that the recurrence of the activity with the permission of the employer resulted in its becoming a compensable incident of the employment.
We agree with the result reached by the County Court but in expressing our views we lay our conclusions on a somewhat broader base. Conceding that the decedent at the time of the accident was serving his own purposes in undertaking to replace the Hollywood muffler on his automobile, this in and of itself does not deprive his dependents of the right to compensation for injury resulting in death while he was so engaged. An employee is not to be deprived of the benefits of the Workmen's Compensation Act simply because he was not actively working when the accident occurred. See Tocci v. Tessler & Weiss, Inc., 28 N.J. 582, 588 (1959). In the Tocci case the court took occasion to review in detail the history of the judicial interpretation of the statutory words "out of and in the course of" the employment and concluded that the facts of each particular case must be examined and determination then made of whether the proofs establish that the subject accident was "work-connected" or whether such accident was "unrelated" to the employment. In so doing the court traced the development of the liberal view taken by our courts in cases involving the "out of and in the course of" provisions of our statute to the rule laid down in Bryant v. Fissell, 84 N.J.L. 72 (Sup. Ct. 1913) wherein it was held that an accident arises out of the employment if it results from a risk "reasonably incidental" thereto and that an accident arises in the course of the employment "if it occurs while the employe is doing what a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time." (28 N.J., at pp. 586-587)
Applying the broad test of whether the accident which resulted in Argroe's death was incidental to his employment and occurred while he was doing what a man so employed *443 might reasonably do within the time during which he was employed, at a place where he might reasonably be during that time, we are firmly convinced that his widow is entitled to compensation.
In our judgment, his customary use of the hydraulic lift for personal purposes in spare time and during business hours with the knowledge and consent of his employer, of itself met the criteria of employer liability and thus placed upon respondents the burden of any risk resulting from such use. But if more need be added, we have no doubt the customary use of the lift by Argroe to service his automobile and maintain its serviceability represented a readily discernible benefit to his employer. This car was used in respondents' business as if it was their own, and it was in their interest that it should be maintained in good condition. Surely, if the vehicle had been put on the lift at the time of the accident for repair in order that it might be taken on the road in service of the master's business, the petitioner's right to compensation could not be questioned. The mere fact, that on this particular occasion the decedent may have been serving his own personal purposes, and that the replacement of the muffler on the car may not have enhanced its value to respondents when used by them in their business operation, in our view is immaterial. The plain fact is that with respondents' knowledge and permission, and indeed encouragement, in the sense that they provided him with the replacement muffler, Argroe was subjected to a risk identical to that from which respondents had benefited on prior occasions. In these circumstances we conclude that the permitted risk was so inextricably woven into the fabric of Argroe's work regimen as to make it an incident of the employment and hence work-connected in the liberal sense in which the Workmen's Compensation Act must be construed. Cf. Yurochko v. Beckley, 61 N.J. Super. 1 (App. Div. 1960).
Affirmed.